Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| LIZ ARCHILLA BETANCOURT<br><br>Apelante<br><br>V.<br><br>GLAXOSMITHKLINE PUERTO RICO INC. Y OTROS<br><br>Apelado<br><br><br>LIZ ARCHILLA BETANCOURT<br><br>Apelado<br><br>V.<br><br>GLAXOSMITHKLINE PUERTO RICO INC. Y OTROS<br><br>Apelante | KLAN202500130<br><br>CONSOLIDADO<br><br>CON<br><br><br><br>KLAN202500132 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2022CV03503 (401)<br><br>Sobre: DESPIDO INJUSTIFICADO (LEY NÚM. 80) Y OTROS |

Panel integrado por su presidenta, la Jueza Domínguez Irizarry, la Jueza Grana Martínez y el Juez Pérez Ocasio.

Grana Martínez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de junio de 2025.

La apelante Liz Archilla Betancourt presentó el Recurso KLAN202500130 en el que solicita que revoquemos la Sentencia Sumaria Parcial en la que el Tribunal de Primera Instancia desestimó las reclamaciones por discrimen y represalias. Por su parte Glaxosmithkline Puerto Rico presentó el Recurso KLAN202500132 en el que solicita que revoquemos la parte de esa sentencia en la que el Tribunal de Primera Instancia se negó a desestimar la reclamación por despido injustificado en su modalidad de despido constructivo. La señora Liz Archilla Betancourt presentó su oposición al recurso KLAN202500132 y Glaxosmithkline hizo lo propio en el

KLAN202500130. Ordenamos la consolidación de ambos recursos porque se apela la misma sentencia.

**I**

Los hechos procesales pertinentes para resolver ambos recursos son los siguientes.

La señora Archilla Betancourt presentó una querella contra Glaxosmithkline por despido injustificado en su modalidad de despido constructivo, discrimen por sexo y represalias. La querella se presentó al amparo del procedimiento sumario laboral e incluyó las alegaciones siguientes. La querellante comenzó a laborar para la demandada el 31 de octubre de 1994, como representante de ventas. El 8 de abril de 2005 fue ascendida a Executive Pharmaceutical Consultant, catalogado como el más alto puesto como representante de excelencia. La querellada lanzó el medicamento Berlysta en el año 2011 para el tratamiento del lupus. A la querellante se le asignó la exclusividad de venta de ese medicamento y se le confirió la categoría de especialista. Durante diez años, fue su única representante de ventas. La querellante desarrolló un registro de los médicos y pacientes con el propósito de llevar las cuentas de las ventas asertivamente.[1]

La querella también incluyó las alegaciones siguientes. La querellada informó a la querellante en el mes de febrero de 2020, que a partir del mes de marzo del mismo año iba a ser supervisada por la división de inmunología del estado de Florida. Su supervisor iba a ser Marcus Laster. La escala salarial de los representantes de ventas que trabajaban en la Florida era mayor que en Puerto Rico. La querellante continuó en la misma escala salarial de Puerto Rico. Sin embargo, a un compañero varón del área de oncología se le ajustó el salario a la escala de la Florida. Charles Ríos hacia el mismo trabajo que la querellante en Puerto Rico. El salario de la querellante era inferior al de sus

---

[1] Apéndice del recurso KLAN202500132, página 14.

compañeros en la Florida, a pesar de que ella tenía más experiencia, hacían el mismo trabajo y tenían las mismas responsabilidades. La querellante no recibió un ajuste de salario, pero se le requirió cumplir las mismas métricas, evaluaciones y responsabilidades que a los empleados de la Florida. La querellante le reclamó a Marcus Laster por su disparidad salarial y porque se sentía discriminada por ser mujer. Igualmente se quejó con la supervisora de Laster, Dominika Witkor Brown por la disparidad salarial y porque sus ventas no se registraban correctamente. No obstante, sus reclamos fueron ignorados.

Otras de las alegaciones de la querella son las que exponemos a continuación. Marcus Laster le informó a la querellante que sus ventas trimestrales eran deficientes. La querellante se quejó nuevamente, porque la data de sus ventas no era correcta y por la disparidad salarial. El patrono reportaba la información de las ventas incorrectamente con números falsos e irreales. porque no tenía la captación completa de las recetas por médico. El problema lo ocasionó el patrono, porque no contrató a un suplidor de data de ventas en Puerto Rico. Sin embargo, tenía un suplidor para los representantes de venta de Estados Unidos. El 1 de febrero de 2021, Laster llamó a la querellante para informarle que su evaluación del año 2020 fue deficiente y que obtuvo el peor rating de C. La intención de Laster era descontrolarla porque sabía que estaba en una reunión. El 8 de febrero de 2021 Laster volvió informarle sobre su pobre desempeño. La querellante recibió la evaluación por escrito durante el mes de marzo de 2021. No obstante, en el mes de febrero de 2021 el director de Estrategia de Data y Operaciones, Jonathan Knight le había informado a Marcus Laster que en el año 2020 no se capturó el volumen de ventas de Benlysta en Puerto Rico. No obstante, la querellada se negó a cambiar la evaluación deficiente, a darle a la querellante el incentivo correspondiente y a removerla del último ranking nacional.

Por último, la querella incluyó las alegaciones siguientes. El 7 de julio de 2021 Marcus Laster informó a la querellante que iba a ser supervisada por Rick Osterholz. El 9 de julio de 2021 la querellada aumentó la meta de ventas a una totalmente irrazonable de alcanzar, porque le exigió vender 1.4 millones de dólares en el trimestre de julio a septiembre de 2021 y el siguiente. El 12 de julio de 2021, Laster le dijo a la querellante que no revisaría las metas impuestas. La querellada tenía la intención de que la querellante fracasara, para despedirla, y ya contaba con una evaluación deficiente. El patrono sometió a la querellante a un patrón de eventos y actos adversos, intencionales, represivos y discriminatorios que impactaron su salud emocional y física y la obligaron a renunciar. Glaxosmithkline cometió los actos adversos contra la querellante en represalia por quejarse de la disparidad salarial y el trato desigual y discriminatorio. La querellante comenzó a ser evaluada con calificaciones bajas sin justificación alguna, a partir de su queja y a pesar de que era la vendedora con más ventas en la empresa. La querellada aumentó las metas de venta para la querellante de forma irrazonable e imposible de alcanzar. El 12 de junio de 2022, la querellante se vio obligada a renunciar.

La querellada presentó una moción de sentencia sumaria. Glaxosmithkline alegó que la querellante admitió que renunció sin conocer el propósito de las decisiones de su supervisor y sin entender que estaba pasando. El patrono argumentó que la querellante (1) no fue amenazada con despedirla, ni disciplinada y que no hubo cambios en los términos y condiciones de su empleo, (2), sus ventas fueron evaluadas con la misma métrica utilizada con todos los empleados sin importar el sexo, (3) la puntuación que recibió fue objetiva y sin influencias indebidas. (4) renunció a base de especulaciones y no alegó represalias en su carta de renuncia, (5) renunció porque los vendedores del estado de la Florida recibían un mayor salario y debido a la nueva

forma de evaluar a los empleados, (6) no pudo identificar a las personas que tomaron represalias o discriminaron en su contra, (7) no sufrió reducciones en sus beneficios ni en su salario y (8) no ejercía las mismas funciones que el empleado varón.[2]

La querellante se opuso a la moción de sentencia sumaria porque la querellada no rebatió la presunción de discrimen debido a que; (1) no presentó prueba para justificar la diferencia salarial entre ella y Charles Ríos, (2) ambos tenían la misma posición, pertenecían a la misma división y sus puestos estaban clasificados en el mismo nivel y tenían las mismas funciones y responsabilidades y, (3) ella tenía 26 años de experiencias en ventas y mayor preparación académica. Su representación legal adujo que no existe controversia de que la querellada tomó represalias en su contra porque (1) se quejó con su supervisor sobre la diferencia salarial con sus compañeros de venta en el Estado de La Florida, (2) presentó una reclamación por la desigualdad salarial y el plan de incentivo para los empleados de la Florida, (3) presentó múltiples quejas sobre la información falsa de las ventas, (4) sus quejas ocasionaron que la apelante tomara represalias en su contra que culminaron con una evaluación como la peor vendedora de la empresa, (5) esa evaluación le quitó la posibilidad de recibir el bono de productividad, (6) la apelante le impuso metas imposibles de alcanzar, y (7) tuvo que renunciar debido a las presiones innecesarias a las que fue sometida por la apelante. Por último, la querellante advirtió que al menos existía dudas sobre los hechos esenciales a los que hizo referencia.[3]

El patrono replicó a la oposición de la querellante a la sentencia sumaria.[4] La querellante presentó una dúplica.[5]

---

[2] Apéndice del recurso, KLAN202500132 página 38.
[3] Apéndice del recurso, KLAN202500132 página 364.
[4]Apéndice del recurso, KLAN202500132 página 991.
[5] Apéndice del recurso, KLAN202500132 página 1369.

El TPI evaluó los escritos de ambas partes y realizó una vista argumentativa. Luego de evaluar la prueba dictó la Sentencia Sumaria Parcial que aquí se cuestiona.[6] El foro recurrido determinó probados los hechos siguientes:

1. La señora Archilla reconoció que, mientras fue empleada de Glaxo, la Compañía tenía políticas anti discrimen y anti represalias.
2. El título de *"Account Manager" y "Account Specialist"* se refieren a la misma posición.
3. Benlysta es un producto utilizado para pacientes con Lupus y Nefritis Lúpica.
4. El Sr. José Diez fue supervisor de la señora Archilla, por cinco (5) años.
5. El Sr. Jaime Irizarry supervisó a la señora Archilla para entre enero y marzo del 2020.
6. Como parte de una reorganización, la señora Archilla se reportaría desde abril 2020 a la división de Benlysta en Florida, bajo la supervisión del Sr. Marcus Laster (señor Laster).
7. Aun cuando la señora Archilla se reportaba a Florida, mantenía como su base a Puerto Rico.
8. Para abril del 2020, el señor Laster supervisaba a siete (7) vendedores, entre ellos, Archilla.
9. La Sra. Dominika Wiktor (señora Wiktor), *"Field Vice President",* era la supervisora del señor Laster para el 2020.
10. El señor Laster le informó a la señora Archilla que dejaría de ser su jefe, el 7 de julio de 2021 y que su próximo gerente sería el Sr. Rick Osterholz (señor Osterholz). El señor Osterholz sería quien la evaluaría para los últimos dos semestres del año 2021.
11. El señor Laster ocupó la nueva posición de *"Specialty Promotional Lead"* y «*Marketing Manager",* para el producto Benlysta, desde el 1 de agosto de 2021 hasta noviembre 2022.
12. El señor Osterholz sustituyó al señor Laster, una vez éste pasa a ser *"Marketing Manager".*
13. El señor Osterholz fue designado como el nuevo gerente de Benlysta para el tercer y cuarto trimestre del año 2021.
14. Antes de renunciar, la señora Archilla sabía que el señor Laster dejaría de supervisarla desde el tercer y cuarto trimestre del 2021.
15. El *"baseline"* se define como las ventas personales de cada vendedor para ese mismo trimestre del año anterior.
16. Para establecer las metas de ventas, Glaxo utiliza el *"baseline"* del empleado para la misma fecha del año anterior y determina de cuánto será el incremento para el año próximo. Por lo cual, el *"baseline"* es de donde sale la base para la meta del próximo año.
17. El *"baseline"* de cada empleado es distinto.
18. La división de *"Sales Operations"* es la que se encargaba de establecer las metas para los vendedores del territorio de Florida, Puerto Rico y todo Estados Unidos para el 2020 y el 2021.
19. El señor Knight era el encargado de la data de Glaxo.
20. El señor Knight nunca fue supervisor de la señora Archilla.

---

[6] Apéndice del recurso, KLAN202500132 página 1568.

21. La responsabilidad primordial de un representante de ventas de Benlysta es promover o vender Benlysta a reumatólogos, nefrólogos y farmacias especializadas.

22. En Puerto Rico existen once (11) farmacias especializadas.

23. En Puerto Rico, la compra de Benlysta se hacía a través de farmacias especializadas.

24. El método del *"Buy-and-Bill"* consiste en que una oficina médica compre el producto, ejemplo Benlysta, de un vendedor al por mayor y luego esa oficina médica le factura a la aseguradora por el producto.

25. A diferencia de Estados Unidos, el método de *"Buy-and-Bill"* no es utilizado en Puerto Rico.

26. Los pacientes de la señora Archilla utilizaban distintas farmacias especializadas.

27. La señora Archilla desconoce qué farmacias especializadas someten data a IQVIA.

28. El 5 de abril de 2021, el señor Laster envió un correo electrónico, informando que la señora Archilla estaba número uno (1) en el *"Secret Sauce Extravaganza"* y la felicitó.

29. Para el *"Secret Sauce Extravaganza"* solamente se iba a premiar a una sola persona; sin embargo, el señor Laster terminó premiando a dos: en primer lugar, al Sr. Geoffrey Williams y, en segundo lugar, a la señora Archilla.

30. En el correo del 11 de febrero de 2021, la señora Archilla le agradeció al señor Laster por una conversación transparente y genuina.

31. El 27 de abril de 2021, le aprobaron a la señora Archilla ir a la convención de reumatólogos.

32. El 30 de abril de 2021, el señor Laster le envió un correo electrónico a la señora Archilla, indicándole que le añadió comentarios positivos en su *"coaching to win",* sobre una visita virtual que ésta tuvo con el doctor Martínez y que sabe que la señora Archilla está haciendo lo mejor que puede dentro de las circunstancias de COVID.

33. A partir de enero 2020, Glaxo estableció nuevos parámetros para evaluar a sus empleados dedicados a la venta de medicamentos (calibración). Dichos parámetros incluyen tres métricas: venta de producto, capacidad (capabilty) y comportamiento (behavior).

34. El proceso de calibración se llevaba a cabo por los gerentes o directores a cargo del producto Benlysta.

35. El análisis del proceso de calibración era discutido posteriormente con los vendedores de forma individual.

36. El señor Laster preparaba notas en anticipación al proceso de calibración.

37. La señora Archilla obtuvo una calificación de "C" en el proceso de calibración, ya que tenía inconsistencias similares a las de otros vendedores que en el proceso de calibración también recibieron una "C".

38. Las ventas no eran el factor determinante para su calificación de "C" recibido por Archilla en su evaluación para el 2020.

39. A pesar de haber recibido una calificación de "C" en su evaluación para el 2020, la señora Archilla recibió, el 4 de marzo de 2021, un aumento total de $1,710.00 a su salario base. Después de dicho aumento el salario base anual de la señora Archilla era de $115,710.00, más bonificaciones. Antes de dicho aumento, su salario base era de $114,000.00, más bonificaciones o incentivos que podían alcanzar los $25,000.00.

40. Los *"AB customers"* son los médicos que Glaxo cataloga como los más importantes a visitar.

41. Los "KPI" son los *"key performance indicators"*. Lo anterior está compuesto de interacciones cara a cara o *"face to face"*, encuentros virtuales, *"Peer-to-Peer"* y llamadas telefónicas con los médicos asignados.

42. El *"Peer-to-Peer"* es un programa cuyo propósito es que el vendedor coordine una presentación que será dada por un médico, sobre el producto Benlysta, en la que se invitaba a los clientes del vendedor coordinador.

43. El *"coaching reports"* era una especie de resumen creado por el gerente, a través del cual se documentaba una interacción virtual y se le informaba al vendedor cómo iba. El vendedor tenía la oportunidad de escribir comentarios, si no estaba de acuerdo con algo de lo contenido en el *"coaching report"*.

44. Todas las interacciones entre el señor Laster y la señora Archilla eran virtuales.

45. El señor Wiktor estuvo de acuerdo con la calificación de "C" dada a Archilla, en su evaluación para el año 2020.

46. El señor Laster nunca amonestó a la señora Archilla por sus ventas, ni le indicó que la despediría.

47. El señor Laster le dejó saber a la señora Archilla que ella podía permanecer en Glaxo, tanto como ella quisiera.

48. Mientras la señora Archilla estuvo en Glaxo, nunca se le redujo el salario.

49. La señora Archilla renunció el 12 dejulio de 2021, mediante carta.

50. La señora Archilla declaró que su carta de renuncia recoge "la manera en que [ella] entendía que estaba pasando todo" y "todo lo que es [su] reclamo".

51. Al momento de su renuncia, la señora Archilla se encontraba en el *"ranking"* o posición número 2 de 232, vendedores.

52. El Sr. José Diez (señor Diez) fue quien entrevistó al Sr. Charles Ríos (Ríos).

53. La relación de la señora Archilla con el señor Diez era excelente.

54. La señora Archilla admitió que el señor Diez nunca discriminó en su contra.

55. La señora Archilla desconoce si a los empleados de Nucala, Jackqueline Ortiz y Luis Ocasio, seguían bajo el plan de incentivo de Puerto Rico o cambiaron al de Estados Unidos.

56. El señor Ríos ocupa el puesto de representante de ventas de Glaxo, en las divisiones de Oncología y Hematología para Puerto Rico.

57. Antes de comenzar en Glaxo en el 2020, el señor Ríos trabajaba para Celgene.

58. El 3 de febrero de 2020, GSK le hizo una oferta de empleo al Sr. Charles Ríos para el puesto de representante de ventas, en la especialidad de oncología, en Puerto Rico.

59. El primer día de trabajo del señor Ríos con Glaxo fue el 17 de febrero del 2020.

60. El señor Ríos gana más que la escala establecida para Puerto Rico, pues negoció su salario y su bono de entrada ("sign-on bonus") con Recursos Humanos, a la luz de las acciones que perdería, por irse de Celgene. El salario base negociado del señor Ríos es de aproximadamente $158,000.00, anuales.

61. Mientras el señor Ríos trabajó en Celgene, recibía una serie de acciones que al momento de su renuncia no estaban

maduras. Ante esto, de él irse antes de que se maduraran, perdería $180,000.00. Por lo cual, Glaxo le dio un bono de entrada ("sign-on bonus") de $178,900.00.

62. La posición del señor Ríos es una altamente especializada.

63. La Sra. Elisa Crumbley (señora Crumbley) es la supervisora del señor Ríos.

64. La señora Archilla no sabe quién en Glaxo decidió pagarle más al señor Ríos.

65. La señora Archilla nunca ha hablado con el señor Ríos.

66. La señora Archilla no participó del proceso de reclutamiento del señor Ríos.

67. La señora Archilla únicamente sabía que había una plaza abierta en Oncología y nunca solicitó dicha plaza.

68. La señora Archilla no podía vender productos de Oncología, porque pertenece a una división distinta a la suya, la cual requiere de una preparación específica.

69. La señora Archilla tiene una Maestría en Administración de Empresas. Su bachillerato es en terapia física del Recinto de Ciencias Médicas.

70. El Sr. Charles Ríos tiene un bachillerato en ciencias naturales.

71. La escala salarial establecida por GSK para Puerto Rico estaba basada en el mercado de Puerto Rico.

72. En abril de 2020, la querellante tuvo conocimiento que GSK había contratado a un nuevo representante de ventas en PR, y que le igualaron la escala salarial con la de Estados Unidos.

73. En mayo 2020, la señora Archilla le presentó la queja de desigualdad salarial, en relación a lo ganado por el señor Ríos al Sr. Marcus Laster, la cual fue reiterada otra vez en mayo y luego en julio 2020.

74. También, en mayo de 2020, la señora Archilla presentó un reclamo a su supervisor que, a los representantes de Puerto Rico, GSK les pagaba menos que a los representantes de Estados Unidos.

75. La señora Vázquez fue reclutada por el señor Osterholz para noviembre de 2021.

76. La señora Archilla desconoce las ventas realizadas por la señora Vázquez.

77. La señora Vázquez ha duplicado las ventas de Benlysta, en Puerto Rico.

78. Los objetivos de ventas, establecidos para la señora Vázquez, eran aquellos que posteriormente le hubieran correspondido a la señora Archilla.

79. Hoy día, el territorio ha tenido un aumento de 82% de ventas del producto Benlysta.

80. La señora Vázquez cumplió con sus metas consistentemente. Actualmente, la señora Vázquez es la vendedora número uno de la Compañía.

81. La querellante, señora Archilla, siempre cumplió con las metas y objetivos de ventas establecidos para Benlysta, en Puerto Rico, demostrando consistencia en su desempeño profesional.

82. El 15 de junio de 2020, Glaxo ascendió a la señora Archilla de Grado 8 a Grado 7 y le aumentaron el salario a $114,000.00.

83. Glaxo adquiere la data de ventas de una compañía externa. Es decir, Glaxo no genera su propia data de ventas y, por ende, no la controla.

84. La señora Archilla desconoce cómo funciona el nuevo método para establecer las metas y expectativas de ventas de Glaxo.

85. Para la fecha en que fue reclutado el señor Ríos, la señora Archilla estaba en un grado más bajo, Grado 8, el mismo grado que tenían los vendedores de Nucala, Jackqueline Ortiz y Luis Ocasio, empleados que pertenecían a la división de la querellante.

Así también determinó que existía controversia sobre los hechos a continuación.

1. Si para el año 2020 Glaxo está compuesta de seis (6) divisiones de ventas, la División de Especialidad (Specialty Division), la División de Vacunas (Vaccine Division), la División Respiratoria (Respiratory Division), la División de Oncología (Oncology Division) y la División de HIV (VIIV Division).

2. Si la División de Especialidad (Specialty División) incluye a oncología.

3. Cómo se establecen desde enero 2020, las metas de venta.

4. Si las condiciones de sueldo que recibía la señora Archilla son causa para un despido injustificado, en su vertiente de despido constructivo.

5. Si es una razón válida para renunciar el haber sido clasificado "C" en la evaluación.

6. Si había base real para que la señora Archilla creyera que la iban a rescindir por obtener una baja en la evaluación.

Finalmente, el TPI desestimó sumariamente las reclamaciones de discrimen por sexo y represalias. No obstante, no desestimó la reclamación por despido injustificado en su modalidad de despido constructivo. Según el foro la querellante no estableció un caso prima facie de discrimen por sexo debido a que; (1) la querellada evidenció y la querellante aceptó que el señor Ríos no tenía sus mismas responsabilidades y obligaciones, (2) ambos eran supervisados por personas distintas y no estaban en la misma división, (3) Ríos estaba dedicado a la venta de medicamentos de oncología y hematología y la querellante a un medicamento para el lupus, (4) la querellante reconoció que el señor Diez nunca la discriminó a pesar de que fue quien reclutó a Ríos, (5) la querellante también reconoció que Marcus Laster no la discriminó, no insinuó que la iba a despedir y le indicó que podía quedarse el tiempo que quisiera, (6) las personas de Glaxo responsables del personal y el sueldo de Ríos no conocían a

la querellante (7) la querellante no pudo mencionar a un solo empleado que la hubiese discriminado, (8) cuando el señor Ríos llegó en el año 2020, tenía una clasificación mayor que la querellante, (9) la querellante recibió el aumento de salario y de puesto, luego de que Ríos llegó a Glaxo, (10) la querellante conocía que el puesto de oncología estaba disponible y no lo solicitó, (11) la querellada tuvo que reclutar y traer a Ríos de otra empresa y, (12) negociar con él su salario porque el patrono anterior le pagaba más.

Al TPI le quedó claro que la querellada probó que la querellante no tenía una causa de acción por discrimen porque; (1) reconoció que era una excelente empleada y la mejor de su unidad en la que trabajaban otro empleado varón y otra mujer, (2) le subió el sueldo en dos ocasiones, aunque en pequeñas cantidades y que, (3) el puesto de Ríos necesitaba un conocimiento distinto y especializado que la apelada no tenía.

No obstante, el TPI determinó que la causa de acción por discrimen prescribió, porque la querellante conocía su existencia desde el mes de abril de 2020, sin embargo, presentó la querella el 11 de julio de 2022. El foro recurrido hizo hincapié en que la querellante no mencionó el discrimen en su carta de renuncia, ya que únicamente mencionó que era injusto que los vendedores de la Florida ganaran más que los de Puerto Rico. Tampoco acogió las alegaciones de daño continuo.

Así las cosas, el foro primario desestimó la reclamación por represalias, porque estaba basada en un discrimen por sexo que nunca ocurrió. El foro apelado tampoco encontró evidencia de represalias, porque la querellante se quejó de que su salario era inferior al de los vendedores del estado de Florida. No obstante, para el TPI esa causa de acción no existe en nuestra jurisdicción, debido a que cada estado tiene su política salarial basada en el mercado. El tribunal advirtió que la querellante no presentó ley ni jurisprudencia que sustentara la

existencia de tal causa de acción. El TPI quedó convencido de que la querellada atendió las quejas de la querellante de discrimen por sexo y lugar de origen y no tomó represalias en su contra. Según el TPI la querellante no presentó evidencia sobre nada que indicara represalias. Por el contrario, encontró evidencia de que la querellante; (1) recibió un aumento de sueldo y de grado, luego de sus quejas, (2) reconoció que el patrono nunca le insinuó que iba a despedirla y que su supervisor le indicó que podía quejarse todo el tiempo y (3) aceptó que el patrono nunca le indicó que la despedirían, no redujo su sueldo y no tomó acciones adversas en su contra.

Aunque el TPI no encontró hechos suficientes para una acción de represalias, encontró hechos que podrían influenciar a una persona a renunciar a su empleo. El TPI no desestimó las reclamaciones por despido injustificado y constructivo, debido a que no existen hechos suficientes para establecer si; (1) el sistema de evaluación fue justo y reflejaba la realidad de las ventas, (2) esa situación causó que la querellante presentara su renuncia, (3) el criterio para evaluar a la querellante era el utilizado para todos los vendedores y se aplicaba de igual manera. El foro apelado hizo constar que el sistema de evaluación estaba basado en; (1) el comportamiento del empleado, (2) su capacidad y (3) las ventas. No obstante, advirtió que los propios abogados del patrono reconocieron que el criterio de ventas era ambiguo. Según el TPI, Glaxo desconocía las ventas realizadas, porque dependía de que fueran declaradas por las farmacias especializadas. No obstante, las farmacias no ofrecían esa información o lo hacían tardíamente. Según el TPI las farmacias no estaban obligadas a informar a la querellada el detalle de las ventas. Además, advirtió que la querellada tampoco recopilaba la información porque lo hacía otra empresa. El TPI enfatizó que el patrono reconoció que utilizó información incompleta para evaluar las ventas. Por último, reconoció que la evaluación del empleado podía afectar negativamente las bonificaciones y los

potenciales ascensos de los empleados y el orgullo de ser reconocidos por la empresa. El TPI prefirió dilucidar la controversia sobre despido constructivo en un juicio en su fondo, debido a las ambigüedades sobre el método de evaluación y el potencial daño que las malas evaluaciones podían tener para la querellante.

En fin, el TPI dictó la Sentencia Parcial apelada en la que desestimó las reclamaciones de discrimen por sexo y represalias. No obstante, no desestimó la reclamación de despido injustificado en su vertiente de despido constructivo.

Inconforme, Glaxo presentó el recurso de apelación en el que alega que:

> ERRÓ EL TA AL NO INCLUIR COMO HECHOS INCONTROVERTIDOS LOS HECHOS 19, 20, 28, 38, 39, 44, 45, 58, 59, 60, 62, 65, 66, 67, 68, 70, 71, 74, 75 Y 94 DE LA MSS.

> ERRÓ EL TPI AL CONCLUIR QUE HABIA CONTROVERSIAS DE HECHOS QUE IMPIDEN LA MISMA CUANDO DICHAS CONTROVERSIAS NO EXISTEN SON INMATERIALES O SON CONTROVERSIAS DE DERECHO.

> ERRÓ EL TPI AL NO DESESTIMAR LA RECLAMACIÓN DE DESPIDO INJUSTIFICADO EN SU MODALIDAD DE DESPIDO CONSTRUCTIVO CUANDO LA QUERELLANTE NO ESTABLECIÓ TODOS LOS REQUISITOS ESPECIFICOS QUE REQUIERE EL ARTÍCULO 5 DE LA LEY NÚM. 80.

Por su parte, la señora Liz Archilla Betancourt presentó el recurso de apelación en el que alega que:

> ERRÓ EL TPI AL INTERPRETAR Y APLICAR INCORRECTAMENTE LA LEY DE REPRESALIAS DESESTIMANDO LA ACCIÓN POR EL FUNDAMENTO DE QUE LA ACTIVIDAD PROTEGIDA EJERCIDA POR LIZ ARCHILLA NO ERA MERITORIA.

> ERRÓ EL TPI AL DESESTIMAR LA ACCIÓN DE REPRESALIAS AL NO RECONOCER LA NATURALEZA ADVERSA DE LOS ACTOS REPRESIVOS PRESENTADOS Y PROBADOS EN EL RÉCORD, Y OMITIENDO CONSIDERAR SU IMPACTO DEVASTADOR EN LAS CONDICIONES DE EMPLEO DE LIZ ARCHILLA.

> ERRÓ EL TPI AL EXCLUIR ARBITRARIAMENTE TODA LA EVIDENCIA QUE ACREDITABA QUE LA META DE VENTAS DE 1.4 MILLONES NO SE ALCANZÓ, BASÁNDOSE EN UNA DECLARACIÓN CONCLUSORIA

QUE RESULTÓ SER FALSA Y QUE POSTERIORMENTE FUE RETRACTADA.

ERRÓ EL TPI AL DESESTIMAR LA RECLAMACIÓN DE DISCRIMEN POR SEXO EN SU MODALIDAD DE DESIGUALDAD SALARIAL CUANDO LIZ ARCHILLA DEMOSTRÓ QUE SU PUESTO Y EL PUESTO DEL VARÓN TENÍAN LAS MISMAS FUNCIONES Y RESPONSABILIDADES PERTENECÍAN AL MISMO NIVEL GRADO Y DIVISIÓN SPECIALTY CARE TENÍA 25 AÑOS DE EXPERIENCIA CON UN HISTORIAL DE DESEMPEÑO SOBRESALIENTE, RECONOCIMIENTOS Y PREMIOS, Y MAYOR PREPARACIÓN ACADÉMICA.

EL TPI INCURRIÓ EN UN GRAVE ERROR DE DERECHO AL DESESTIMAR POR PRESCRIPCIÓN LA ACCIÓN DE DISCRIMEN SALARIAL POR RAZÓN DE SEXO CUANDO GSK NUNCA PRESENTÓ EL ARGUMENTO DE PRESCRIPCIÓN EN SU MOCIÓN DE SENTENCIA SUMARIA, PRESENTÁNDOLA POR PRIMERA VEZ EN UNA VISTA ARGUMENTATIVA SEÑALADA PARA DISCUTIR LA MOCIÓN DE SENTENCIA SUMARIA, Y CUANDO LA DEFENSA HABÍA SIDO RENUNCIADA POR HABER SIDO PRESENTADA EN VIOLACIÓN A LAS REGLAS DE PROCEDIMIENTO CIVIL.

EL TPI ERRÓ AL DESESTIMAR POR PRESCRIPCIÓN LA RECLAMACIÓN DE DISCRIMEN POR DESIGUALDAD SALARIAL Y NO APLICAR LA DOCTRINA DE DAÑOS CONTINUOS, A PESAR DE RECONOCER LA EXISTENCIA DE HECHOS RELACIONADOS QUE PUDIERON HABER INFLUENCIADO LA RENUNCIA DE LIZ ARCHILLA.

## II

**Moción de Sentencia Sumaria**

Nuestro ordenamiento procesal civil reconoce el uso y valor que tiene la sentencia sumaria para asegurar una solución justa, rápida y económica de los casos. La herramienta procesal de la sentencia sumaria posibilita la pronta resolución de una controversia, cuando no es necesario celebrar un juicio en su fondo. *Soto y otros v. Sky Caterers* 2025 TSPR 3; 215 DPR ___ (2025). No obstante, para que proceda es necesario que, de los documentos no controvertidos, surja que no hay controversia real y sustancial sobre los hechos materiales del caso. Un hecho material es aquel que puede afectar el resultado de la reclamación, de acuerdo con el derecho sustantivo aplicable. La controversia sobre los hechos materiales tiene que ser real. Cualquier duda es insuficiente para derrotar una moción de sentencia sumaria.

La sentencia sumaria procede cuando no existe controversia de hechos materiales y únicamente resta aplicar el derecho. *BPPR v. Cables Media,* 2025 TSPR 1, 2015 DPR ___ (2025); *BPPR v. Zorrilla y otros,* 2024 TPPR 62; 214 DPR ___ (2024); *Cruz, López v. Casa Bella y otros,* 213 DPR 980, 993 (2024), *Universal Ins. y otro v. ELA y otros,* 211 DPR 455, 471-472 (2023).

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, exige el cumplimiento de ciertos requisitos. La parte contra quien se haya formulado una reclamación podrá presentar una moción de sentencia sumaria, no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, según lo dispuesto en la Regla 36.2, 32 LPRA Ap. V. La Regla 36 contiene los requisitos de forma para instar una moción de sentencia sumaria y su respectiva oposición. La parte que sostenga la inexistencia de una controversia sustancial de hechos esenciales y pertinentes debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible. Además, tanto la moción como la oposición deberán cumplir con lo establecido en la Regla 36.3, *supra.* La sentencia sumaria no puede dictarse cuando, (1) existen hechos esenciales controvertidos, (2) la demanda tiene alegaciones afirmativas que no han sido refutadas, (3) existe una controversia real sobre algún hecho esencial o material que surge de los propios documentos que acompañan la moción o (4) no procede como cuestión de derecho. *Consejo Tit. v. Rocca Dev. Corp. et als.,* 215 DPR __ (2025); *Universal Ins. y otro v. ELA y otros,* supra, pág. 472.

El Tribunal Supremo de Puerto Rico ha resuelto que el uso de la sentencia sumaria no es aconsejable en casos complejos en los que no existe controversia sobre elementos subjetivos, de intención, propósitos mentales, negligencia o credibilidad. *Soto y otros v. Sky Caterers, supra.* No obstante, eso no impide utilizar el mecanismo de sentencia sumaria en reclamaciones que requieren elementos subjetivos o de intención,

como en los casos de discrimen, cuando de los documentos a ser considerados surge que no existe controversia de hechos materiales. *Soto y otros v. Sky Caterers,* supra.

El Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia, al momento de revisar las solicitudes de sentencia sumaria. Al igual que el TPI tiene que regirse por la Regla 36, *supra,* y aplicar los criterios que esa regla y su jurisprudencia interpretativa exigen. Ambos foros tienen que revisar que la moción de sentencia sumaria y su oposición cumplan los requisitos de forma codificados en la Regla 36, *supra.* El Tribunal de Apelaciones no podrá considerar evidencia que las partes no presentaron en el Tribunal de Primera Instancia. Este foro tampoco podrá adjudicar los hechos materiales en controversia, porque esa es una tarea del Tribunal de Primera Instancia. La revisión que hace el Tribunal de Apelaciones es la de un juicio de novo. El foro apelativo debe examinar el expediente de la manera más favorable para la parte opositora a la moción de sentencia sumaria y hacer todas las inferencias permisibles a su favor. *Consejo Tit. v. Rocca Dev. Corp. et als.,* supra; *Soto y otros v. Sky Caterers, supra; BPPR v. Cables Media,* supra; *Cruz, López v. Casa Bella y otros,* supra; pág. 924, *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015).

Al revisar una sentencia sumaria, el Tribunal de Apelaciones tiene que evaluar si realmente existen hechos materiales en controversia. Cuando determina que existen hechos materiales en controversia debe exponer cuáles son. Además, tiene que determinar cuáles están incontrovertidos. Si encuentra que todos los hechos materiales están realmente incontrovertidos, procede que revise de novo, si el TPI aplicó correctamente el derecho. *Meléndez González et al. v. M. Cuebas,* supra, pág. 119.

**Discrimen**

El principio de igual paga por igual trabajo está consagrado en la Sec. 16 del Art. II de la Constitución de Puerto Rico, Art. II, sec. 16, Const. P.R. LPRA Tomo 1. La política pública que inspiró a los constituyentes fue brindar a los trabajadores del servicio público un tratamiento equitativo y justo en la fijación de sus sueldos y demás formas de retribución. *Rivera Padilla v. OAT,* 189 DPR 315, 355 (2013). No obstante, esta protección constitucional también cobija a los empleados del sector privado. *Municipio de Guaynabo v. Tribunal Superior,* 97 DPR 545, 549-550 (1969). Su génesis se remonta a la época en que con frecuencia el salario de las mujeres era inferior al de los varones, a pesar de realizar la misma o mayor labor. La cláusula constitucional de igual paga por igual trabajo, evita el discrimen cuando no existe justificación para esa compensación diferente. Sin embargo, este principio no es absoluto. Los años de servicio y las diferentes cualidades del personal son factores que justifican retribuciones distintas *Landrau Cabezudo v. La Autoridad* 2025 TSPR 7, 215 DPR ___ (2025). Nuestra legislatura aprobó la Ley de Discrimen en Empleo por Razón de Sexo, Ley Número 69 del 6 de julio de 1985, 29 LPRA sec. 1321 y siguientes para garantizar la igualdad del derecho al empleo entre hombres y mujeres. Esta legislación prohíbe el discrimen e impone responsabilidades y penalidades a los patronos que incurran en esa conducta.

**El esquema probatorio en las reclamaciones por discrimen en el empleo.**

La Reforma Laboral establecida mediante la Ley Núm. 4-2017 conocida como Ley de Transformación y Flexibilidad Laboral, 29 LPRA sec. 121 et seq., eliminó la presunción controvertible de discrimen que contenía la Ley Núm. 100, *supra.* La enmienda equiparó la forma de probar discrimen al amparo de Ley Núm. 100, *supra,* con el esquema probatorio existente en la esfera federal. La presunción eliminada

transferiría al patrono el peso de la prueba para persuadir al tribunal. No obstante, al adoptar el esquema federal, es entonces necesario que el empleado demandante demuestre la existencia de un caso prima facie de discrimen. Al patrono únicamente se le transfiere el peso de presentar prueba. El empleado demandante siempre conserva el peso de persuadir al tribunal. El caso prima facie de discrimen, se configura cuando el empleado establece que; (1) es miembro de un grupo protegido, (2) estaba cualificado para el trabajo, (3) fue despedido y (4) el patrono buscó reemplazarlo por otras personas con cualificaciones similares. El empleado activa una presunción a su favor, si demuestra la existencia de un caso prima facie de discrimen. El patrono entonces tiene que presentar evidencia admisible sobre la existencia de una razón legitima y no discriminatoria para la acción adversa. El patrono no tiene que convencer al juzgador de que la razón proferida es causa verdadera o que en estricto derecho es justa causa para el despido. Al patrono solo se le requiere presentar evidencia meramente suficientemente clara y específica para sostener que el motivo determinante no fue discriminatorio. La presunción de discrimen desaparece, cuando el patrono ofrece su explicación. El demandante tiene la oportunidad de demostrar mediante preponderancia de la prueba que la razón ofrecida es un pretexto para ocultar el discrimen intencional. *Soto y otros v. Sky Caterers,* supra.

**Término prescriptivo de las reclamaciones de discrimen presentadas al amparo de la Ley Núm. 100 de 30 de junio de 1959.**

El término prescriptivo de las reclamaciones por discrimen presentadas al amparo de la Ley Núm. 100, supra*,* es de un año y comienza desde que ocurrió el acto o acción discriminatoria. Según lo resuelto en *Suarez Ruiz v. Figueroa Colón*, 145 DPR 142, 149-150 (1998), el término prescriptivo de las leyes dirigidas a erradicar el discrimen por razón de sexo en el empleo es de un año, en ausencia de una disposición legislativa al respecto.

**Daños Sucesivos y Daños Continuos.**

Los daños sucesivos y los continuos afectan la forma de computar el término prescriptivo. Los daños sucesivos son una secuencia de reconocimiento de consecuencias lesivas por parte del perjudicado. Estas consecuencias lesivas se producen y manifiestan periódicamente o aun continuamente. No obstante, se van conociendo en momentos distintos entre los que medio un lapso finito. Los daños subsiguientes no son previsibles en ningún momento y no es posible descubrirlos aun empleando diligencia razonable. Su característica principal es que la repetición del daño no es previsible. *Rivera Prudencio v. Municipio de San Juan,* 170 DPR 149, 167-168 (2007). Por esa razón, cada acto tiene su propio término prescriptivo, que comienza en diferentes momentos y depende de cuando el perjudicado tuvo conocimiento de cada suceso. *Nazario Acosta v. ELA,* 159 DPR 799, 808 (2003).

Los daños continuos son la suma de eventos pequeños o insignificantes. Sus rasgos distintivos son las siguientes; (1) los actos negligentes o intencionales pueden atribuirse al mismo actor, (2) los daños causados se manifiestan sin interrupción y, (3) en conjunto conforman un proceso perjudicial progresivo y de carácter unitario. El Tribunal Supremo de Puerto Rico resolvió que el hostigamiento sexual en el empleo produce daños de naturaleza continua. Aunque, cada uno de los actos sufridos, sean aislados están relacionados el uno con el otro y forman parte de un patrón de hostigamiento. Los daños continuados configuran una sola causa de acción que incluye todas las consecuencias lesivas ininterrumpidas ocasionadas por los actos culposos o negligentes. El término prescriptivo comienza a partir de lo que sea posterior, entre último acto u omisión o la producción del resultado definitivo. *Velázquez Ortiz v. Mun. De Humacao,* 197 DPR 656, 665-667 (2017). Por otro lado, cada vez que el patrono le paga el salario a un empleado sin el aumento que le corresponde por años de servicio,

la causa de acción surge nuevamente, debido a que los daños son continuos. *JRT v. AEE,* 113 DPR 564, 567 (1982).

**Ley contra el Despido Injusto o Represalias a todo Empleado por Ofrecer Testimonio ante un Foro Legislativo, Administrativo o Judicial, conocida como, Ley de Represalias.**

La Ley Núm. 115-1991, 29 LPRA sección 194 el seq., protege a los empleados de las represalias que el patrono pueda cometer en su contra, por proveer un testimonio o información verbal o escrita, o hacer una expresión en un foro judicial, legislativo o administrativo. Esta legislación incluyó como actividad protegida, el testimonio, expresión o información que ofrezca o intente ofrecer un empleado con los procedimientos internos establecidos de la empresa o ante cualquier empleado o representante en una posición de autoridad. La represalia se compone del despido, el discrimen y la amenaza con relación a los términos y condiciones del empleo. El agente de un patrono que comete esa conducta actúa en el ejercicio de la autoridad patronal. El patrono es quien tiene en última instancia el poder de decidir la condición laboral de un empleado. *Santiago Nieves v. Braulio Agosto Motors,* 197 DPR 369, 380 (2017).

Un empleado puede establecer un caso de represalias mediante dos vías distintas. La primera es probar la violación mediante evidencia directa o circunstancial que demuestre un nexo causal entre la conducta del patrono demandado y el daño sufrido. La segunda es demostrando la existencia de un caso prima facie de su faz, mediante la presunción *juris tantum* de la Ley Número 115, *supra. Rivera Menéndez v. Action Service Corp.,* 185 DPR 431, 445 (2012); *SLG Rivera Carrasquillo v. AAA,* 177 DPR 345, 362 (2009). Cuando el obrero presenta un caso prima facie, crea una presunción de que el despido fue en concepto de represalia. Un empleado establece un caso prima facie con prueba preponderante de que; (1) participó en una actividad o conducta protegida por ley, (2) sufrió una acción adversa por parte del patrono y (3) existe un nexo causal entre la conducta protegida y la

referida acción adversa. Al patrono le corresponde entonces rebatir la presunción fundamentado que el despido es legítimo. Si el patrono cumple este segundo paso, el empleado debe demostrar que la razón alegada por el patrono es un mero pretexto para la acción adversa. *Feliciano Martes v. Sheraton,* 182 DPR 368, 396 (2011); *SLG Rivera Carrasquillo v. AAA,* supra, pág. 362.

La exigencia de que el empleado haya sido despedido, amenazado o discriminado, subsiguiente a su incursión en la actividad protegida, se cumple cuando demuestra que la acción adversa ocurrió al poco tiempo de dicha incursión. No obstante, si la proximidad temporal no es evidente, puede demostrar el nexo causal de alguna de las maneras siguientes; (1) fue tratado de forma distinta a otros empleados, (2) existió un patrón de conducta antagónica en su contra, (3) las razones articuladas por el patrono para fundamentar su acción adversa están plagadas de incongruencias o (4) cualquier otra evidencia que obre en el expediente para establecer el elemento del nexo causal. *Feliciano Martes v. Sheraton,* supra, págs. 399-400.

**Despido Constructivo**

La definición de despido injustificado contemplada en la Ley Número 80, supra, es amplia. El despido no está limitado a la gestión concreta del patrono de prescindir de los servicios de un empleado. Una de sus modalidades es el despido constructivo, que ocurre cuando un empleado renuncia, porque las actuaciones del patrono estaban dirigidas o encaminadas a inducirlo o forzarlo a renunciar. Las actuaciones del patrono pueden consistir en imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo de categoría o someterlo a vejámenes o humillaciones de hecho o palabra. El trabajador debe sentirse tan incomodo con la situación laboral que no tiene otro remedio que abandonarlo. El distintivo peculiar de un despido constructivo reside en que el patrono fuerza al empleado a dimitir de su trabajo. *León Torres v. Rivera Lebrón,*

204 DPR 20, 38 (2020); *Rivera Figueroa v. The Fuller Brush Corp.*, 180 DPR 894, 907-908 (2011).

No obstante, el despido constructivo no se configura por cualquier molestia o condición antipática en el empleo. Los vejámenes y humillaciones tienen que ser de magnitud sustancial. El ambiente de empleo debe tornarse intolerable a tal nivel que la única alternativa razonable para el empleado afectado es dimitir. La intensidad y alcance de la conducta patronal en controversia, se examinará objetivamente. Los tribunales tienen que evaluar si una persona razonable se sentiría forzada a renunciar como resultado de las acciones del patrono. *León Torres v. Rivera Lebrón, supra,* pág. 39; *Rivera Figueroa v. The Fuller Brush Corp.*, supra, pág. 908.

Las acciones del patrono deben exhibir un nivel de seriedad considerable. Los simples malentendidos o situaciones antipáticas que no tienen el efecto de crearle al empleado un ambiente de trabajo que resulte intimidante, hostil y ofensivo no constituyen un despido constructivo. Las actuaciones del patrono que conllevan despido constructivo tienen que ser arbitrarias, irrazonables y caprichosas y generar una atmosfera hostil que impidan del todo la sana estadía del obrero en el trabajo y originadas por un motivo ajeno al interés legítimo de salvaguardar el bienestar de la empresa. Las acciones administrativas legítimas realizadas únicamente para salvaguardar el bienestar de la empresa, no dan lugar a un despido constructivo, siempre que el patrono no haya actuado con la intención de lesionar la condición del empleado. *Rivera Figueroa v. The Fuller Brush Corp.*, supra, pág.919.

**III**

La querellante cuestiona la desestimación sumaria de las reclamaciones de discrimen por razón de sexo y represalia. Nuestro juicio de novo de la prueba, nos obliga a concluir que el TPI desestimó correctamente ambas causas de acción. La querellante alegó que la

querellada le pagaba un salario inferior al de un empleado varón que ocupaba su misma posición. Sin embargo, no estableció un caso prima facie de discrimen. Por el contrario, en el expediente existe prueba preponderante, que demuestra que el patrono no discriminó en su contra.

La propia querellante confirmó que no fue discriminada por sexo. *La señora Archilla no alegó el discrimen por sexo en su carta de* renuncia.[7] La querellante admitió en su deposición que; (1) trabajaba en una unidad distinta al señor Charles Ríos quien es el empleado varón que alega tenía un salario superior al suyo, (2) ella trabajaba en la unidad de inmunología y el señor Charles Ríos en oncología,[8] (3) el señor Ríos es el único empleado en su unidad de negocio,[9] (4) ella no podía vender medicamentos de oncología, porque necesitaba unos exámenes especializados,[10] (5) Ríos no podía vender Benlysta,[11] (6) ambos trabajaban en áreas distintas y especializadas en las que el vendedor debía tener expertise,[12] (7) ambos vendían productos distintos,[13](8) antes de anunciarle que se reportaría a Estados Unidos fue informada de que su salario no cambiaría y que se quedaría con la escala de Puerto Rico,[14](9) su reclamación de discrimen estaba basada exclusivamente en la diferencia salarial con el señor Ríos,[15](10) Ríos tenía un salario más alto antes de que fuera trasladada a reportarse a la Florida,[16](11) ella era quien más ganaba en Puerto Rico y estaba en el tope de la escala,[17] (12) Jaime Irrizarry nunca la discriminó,[18] (13) conocía que había una plaza disponible en oncología y no la solicitó.[19]

---

[7] Apéndice del recurso KLAN202500132, página 291.
[8] Apéndice del recurso KLAN202500132, página 79.
[9] Apéndice del recurso KLAN202500132, página 90.
[10] Apéndice del recurso KLAN202500132, página 93.
[11] Id.
[12] Apéndice del recurso KLAN202500132, página 94.
[13] Apéndice del recurso KLAN202500132, página 95.
[14] Apéndice del recurso KLAN202500132, página 101.
[15] Apéndice del recurso KLAN202500132, página 161.
[16] Apéndice del recurso KLAN202500132, página 162.
[17] Apéndice del recurso KLAN202500132, página 163.
[18] Apéndice del recurso KLAN202500132, página 89.
[19] Apéndice del recurso KLAN202500132, página 93.

El señor Charles Ríos aclaró en su deposición, porque su salario era mayor al de la querellante. Según declaró; (1) lo buscaron de Glaxo, porque iban a abrir una división de oncóloga,[20] (2) el 3 de febrero de 2020 recibió una oferta de la Oficina de Recursos Humanos de Estados Unidos donde se determinó su salario y escala,[21] (3) tiene dos títulos, uno de *oncology account manager* y, otro de *hematology account manager*,[22] (4) condicionó su salario a que le compensaran el dinero que iba a perder por renunciar a su anterior empleo,[23] (5) está por encima de la escala salarial porque tenía un empleo en el que le pagaban más y no se iba a ir por menos dinero, y[24] (6) recibió una compensación *Platinum Award*, porque creo un sistema de distribución.[25]

Por otro lado, las alegaciones de discrimen porque los vendedores del estado de la Florida ganaban más que los de Puerto Rico, carecen de fundamentos. La propia querellante admitió que son dos mercados distintos. La querellante reconoció que en la Florida las ventas se hacen directamente (*buy and bill*) porque el setenta por ciento (70%) de los reumatólogos tienen centros de infusión. La querellante admitió que ese no es el caso de Puerto Rico, donde las ventas se hacen a través de las farmacias especializadas.[26] Además, admitió que no sabía cuánto ganaban los vendedores de Nucala, Luis Ocasio y Jaqueline Ortiz.[27],

La querellante tampoco estableció un caso de represalias por ninguna de las dos vías posibles. La señora Archilla no demostró la existencia de evidencia directa o circunstancial que estableciera un nexo causal entre la conducta del patrono y el daño alegadamente sufrido. Tampoco demostró un caso prima facie de represalias. La

---

[20] Apéndice del recurso KLAN202500132, página 758.
[21] Apéndice del recurso KLAN202500132, páginas 769-770.
[22] Apéndice del recurso KLAN202500132, página 771.
[23] Apéndice del recurso KLAN202500132, páginas 778-780.
[24] Apéndice del recurso KLAN202500132, páginas 814-815.
[25] Apéndice del recurso KLAN202500132, página 817.
[26] Apéndice del recurso KLAN202500132, página 132.
[27] Apéndice del recurso KLAN202500132, página 163.

querellante sostiene que fue víctima de represalias, por quejarse de que el señor Ríos ganaba más por ser hombre, y porque los vendedores residentes de la Florida tenían un salario superior a los de Puerto Rico. Sin embargo, admitió que tenía una relación excelente con José Díez y Jaime Irizarry. Ambos fueron sus supervisores, antes de Marcus Laster. José Diez fue la persona que entrevistó a Ríos para ser reclutado por la querellada.[28]

La señora Archilla admitió que Marcus Laster nunca le dijo que iba a despedirla, y que no fue amonestada por sus ventas. Por el contrario, reconoció que Marcus Laster le dijo que podía justificar sus KPI y actividad de trabajo, que nadie iba a venir de Estados Unidos a reemplazarla y que ella era necesaria.[29] La querellante aceptó que; (1) recibió el segundo premio en el *Secret Sauce Extravaganza*,[30] y que, (2) el 30 de abril Marcus Laster le envió un correo que decía a *very positive progress note to that action item as well*.[31] Por otro lado, la querellante no pudo especificar quien tomó represalias en su contra.[32]

Otras admisiones de la querellante que derrotan sus alegaciones de represalias son las siguientes; (1) el patrono nunca redujo su salario,[33] (2) durante la supervisión de Marcus Laster recibió un aumento de dos mil dólares ($2,000.00) y fue promovida al nivel 7,[34](3) renunció porque pensaba que el nuevo supervisor iba a despedirla,[35] (4) al momento de su renuncia estaba en el ranking 2,[36] (5) tenía una buena relación con Rick Osterholz y nunca tuvo problemas con él,[37](6) Marcus Laster nunca le dijo que podían despedirla, si no cumplía con las ventas,[38] (7) le pagaron como si hubiese cumplido con el cien por

---

[28] Apéndice del recurso KLAN202500132, páginas 82, 84 y 90.
[29] Apéndice del recurso KLAN202500132, páginas 125-127.
[30] Apéndice del recurso KLAN202500132, páginas 130 y 138.
[31] Apéndice del recurso KLAN202500132, página 141.
[32] Apéndice del recurso KLAN202500132, páginas 152-153.
[33] Apéndice del recurso KLAN202500132, página 154.
[34] Apéndice del recurso KLAN202500132, páginas 155 y 157.
[35] Apéndice del recurso KLAN202500132, página 158.
[36] Apéndice del recurso KLAN202500132, página 160.
[37] Id.
[38] Apéndice del recurso KLAN202500132, página 161.

ciento de las ventas igual que a todo el mundo, y[39] (8) le dijeron que era necesaria.[40] Su declaración jurada evidencia la ausencia de una causa de acción por represalias. La señora Archilla reconoció que trabajó para la demandada 26 años, tuvo 11 supervisores y consecuentemente evaluaron su desempeño como sobresaliente o excepcional y fue premiada por sus ventas.[41]

Por último, la querellante sostiene que el TPI concluyó incorrectamente que la reclamación de discrimen por disparidad salarial estaba prescrita. La querellante alega que esa reclamación no prescribió, porque los daños son de naturaleza continua.

Según el TPI la querellante admitió que; (1) conocía la existencia de la causa de acción desde el mes de abril de 2020, (2) se quejó de la situación con su supervisor en el mes de mayo de 2020 y (3) reiteró su queja en el mes de junio de ese mismo año. El foro determinó que la querellante no volvió a querellarse por la alegada acción discriminatoria ni la incluyó como una de las razones de su renuncia. Por eso resolvió que la reclamación estaba prescrita, cuando se presentó la querella el 11 de julio de 2022.

La querellante alega que la acción por disparidad salarial por sexo no está basada en un solo acto, y sostiene que el acto discriminatorio es de naturaleza continua. Según esta, en el discrimen salarial cada pago desigual constituye un acto nuevo de discrimen que reabre el plazo prescriptivo. Por esa razon argumenta que se configuraba una nueva violación, cada vez que recibía una paga inferior a la del representante de ventas varón. Su representación legal aduce que en ese momento se establecía un nuevo término para presentar la acción de discrimen salarial. La querellante invoca la aplicación de *JRT v. AEE,* supra.

---

[39] Apéndice del recurso KLAN202500132, página 110.
[40] Apéndice del recurso KLAN202500132, página 127.
[41] Declaración Jurada, Apéndice del recurso KLAN202500132, página 845.

Por su parte, la querellada sostiene que la reclamación de discrimen de la querellante es ajena a la doctrina de violación continua.

La querellante tiene razón. La reclamación de discrimen no prescribió porque los daños alegados son continuos. El Tribunal Supremo de Puerto Rico resolvió en *JRT v. AEE, supra,* que cada vez que el patrono le paga el salario a un empleado sin el aumento que le corresponde, su causa de acción surge nuevamente. No obstante, aunque la causa de acción no está prescrita la querellante no estableció una causa de acción por discrimen.

En otro orden de cosas, los errores que alega el patrono se reducen a determinar si no existe controversia de hechos esenciales que impida la desestimación sumaria de la reclamación por despido injustificado en su modalidad de despido constructivo.

El patrono sostiene que la querellante no estableció los requisitos del Artículo 5 de la Ley Núm. 80, *supra.* La querellante argumenta que el patrono la sometió a un patrón de eventos y actos adversos, intencionales, represivos y discriminatorios que impactaron su salud emocional y física y, la obligaron a renunciar. Según la querellante la Glaxo la obligó a renunciar porque; (1) la evaluó deficientemente, debido a que cuantificaba sus ventas a base de una data incompleta e incorrecta, (2) su supervisor se negó a corregir la evaluación deficiente y a darle el incentivo correspondiente, a pesar de que el director de estrategia de data le advirtió que el volumen de las ventas de Benlysta del año 2020 no se capturó correctamente, y (3) le exigió vender la cantidad irrazonable de 1.4 millones de dólares en el trimestre de julio a septiembre de 2021 y para el siguiente.

El TPI no cometió el error que alega el patrono. Un juicio de novo de la totalidad del expediente nos obliga a concluir que existe controversia sobre los hechos esenciales siguientes:

(l) la razón por la que la querellante renunció a su empleo,

(2) si el patrono actuó de forma arbitraria, caprichosa o irrazonable, debido a la forma en que cuantificó las ventas, evaluó deficientemente e impuso nuevas metas a la querellante,

(3) si las actuaciones del patrono forzaron e indujeron a la señora Archilla a renunciar,

(4) si cualquier persona razonable en su misma situación hubiese renunciado, porque el patrono creó una atmósfera hostil que impedía una sana estadía en el empleo.

A nuestro juicio no está claro, si la querellante se vio obligada a renunciar porque el patrono adoptó un sistema de evaluación que no reflejaba la realidad de sus ventas. Según el TPI los abogados del patrono admitieron; (1) la ambigüedad del criterio de evaluación sobre las ventas, (2) que la compañía dependía de que las farmacias especializadas proveyeran la información sobre las ventas y (3) las farmacias proveían la información tardíamente. El foro recurrido hizo constar que las farmacias no recopilaban la información y tampoco estaban obligadas a informar el detalle de las ventas.[42] Las admisiones de la representación legal del patrono evidencian que cuantificó las ventas, a base de información incompleta. No podemos despachar sumariamente la causa de acción por despido constructivo, porque coincidimos con el TPI en que la recopilación incompleta de las ventas podía afectar negativamente las evaluaciones, bonificaciones y ascensos potenciales de la querellante e incluso ocasionar su despido.[43]

El testimonio de la querellante fortalece nuestra determinación de no desestimar sumariamente la reclamación por despido constructivo. La querellante declaró que únicamente podía venderles a las farmacias especializadas. Según la querellante sus ventas no se reflejaban correctamente porque la información solo podía obtenerse a través de IOVIA y el patrono no compraba la data.[44]

---

[42] Apéndice del recurso KLAN202500132, página 1602.
[43] Id.
[44] Apéndice del recurso KLAN202500132, páginas 109, 11 y 132.

La señora Archilla presentó una declaración jurada. En ella declaró que hizo múltiples reclamos a su supervisor Marcus Laster, porque sus ventas no se estaban registrando. Según la querellante le pidió a Laster que validara las ventas con su *tally*, para que corrigiera las grandes deficiencias registradas. La querellante dijo que sus reclamos no fueron escuchados y que las ventas reportadas fueron cientos de miles de dólares menos que las realizadas.[45] Además, consta en su testimonio que la querellada comenzó a comprar la data de las ventas, a partir de abril a junio de 2021. La querellante dijo que, para mayo de 2021, la querellada tenía la data real que demostraba que la data el 2020 era falsa. Aun así, se rehusó a cambiar su evaluación y a concederle el incentivo que le correspondía, a pesar de que en el año 2020 no se reportaron miles de dólares en ventas.[46]

Por su parte, Marcus Laster reconoció que la querellada obtenía la información sobre de las ventas de una compañía externa y que no todas las farmacias especializadas suplían la información.[47] El deponente reconoció que la querellante le proveyó una lista de médicos y pacientes y creía que la información era cierta. Sin embargo, declaró que no era responsable de verificarla.[48] Marcus Laster admitió que, (1) no verificó el *tally* de la querellante, ni los beneficios que obtuvo la querellada como resultado de sus ventas,[49] (2) la data de las farmacias especializadas sobre las ventas del año 2020 estuvo disponible en el año 2021,[50] (3) desconocía si la data era o no correcta,[51] (4) no tenía ningún control de la data de las ventas reportadas,[52] (5) no verificaba ni sabía si la data del 2020 era correcta,[53] (6) no tenía el control de la data de ventas, porque no estaba en sus responsabilidades,[54] (7) no

---

[45] Apéndice del recurso KLAN202500130, página 1217.
[46] Apéndice del recurso KLAN202500130, página 1219.
[47] Apéndice del recurso KLAN202500132, página 601.
[48] Apéndice del recurso KLAN202500132, página 607.
[49] Apéndice del recurso KLAN202500132, páginas 607 y 608.
[50] Apéndice del recurso KLAN202500132, página 673.
[51] Apéndice del recurso KLAN202500132, página 674.
[52] Apéndice del recurso KLAN202500132, página 675.
[53] Apéndice del recurso KLAN202500132, página 676.
[54] Apéndice del recurso KLAN202500132, página 682.

existe garantía de que se capturó el 100 por ciento de la data en Puerto Rico, y[55] (8), las farmacias no eran parte de la red de la querellada.[56]

Por otro lado, no podemos pasar inadvertido que la señora Archilla fue evaluada como deficiente y que el *baseline* de sus ventas aumento significativamente para el segundo trimestre del año 2021. Este tribunal entiende que es necesario que se dilucide en un juicio en sus méritos, si la falta de un sistema certero para determinar las ventas, unido a una evaluación deficiente y a las nuevas metas de ventas impuestas indujeron a la querellante a renunciar y si esa decisión fue razonable. El patrono propone unos hechos que alega fueron probados. No obstante, los hechos propuestos no demuestran que la querellante carece de una causa de acción por despido constructivo.

**IV**

De tal manera y por las razones antes expresadas, se confirma en su totalidad la sentencia apelada.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

La Jueza Domínguez Irizarry concurre sin opinión escrita.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[55] Apéndice del recurso KLAN202500132, página 694.
[56] Apéndice del recurso KLAN202500132, páginas 696 y 717.